IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONTGOMERY COUNTY INTERMEDIATE      :        CIVIL ACTION
UNIT NO. 23                         :
                                    :
            v.                      :
                                    :
C.M., et al.                        :        NO. 17-1523

MEMORANDUM

Bartle, J.                                   October 12, 2017


          Plaintiff Montgomery County Intermediate Unit No. 23

("MCIU") brings this action for review of a decision by a

special education hearing officer awarding compensatory

education to defendants C.M. and his parents J.M. and C.M. under

the Individuals with Disabilities Education Act ("IDEA"),

20 U.S.C. §§ 1400 et seq.  Before the court is the motion of

MCIU for judgment on the administrative record.

                              I.

          Under the IDEA, states receiving federal educational

funds must provide, among other things, a free appropriate

public education ("FAPE") to disabled children between the ages

of three and twenty-one.  See 20 U.S.C. § 1412(a)(1)(A).  The

statute further obligates states, acting through local

educational agencies, to identify, locate, and evaluate children

who are in need of special education and related services.  Id.

§ 1412(a)(3)(A).  Once a child is identified, the agency must

develop an individualized education program ("IEP") for the
child. Id. § 1412(a)(4); § 1414(d). The IEP is a comprehensive
plan prepared by a team, including the child's teachers and
parents, in compliance with a detailed set of procedures. Id.
§ 1414(d). Once the IEP team has decided on an IEP for a child,
the agency shall issue a written notice of recommended
educational placement ("NOREP"), which then must be approved or
rejected by the child's parents. See id. § 1415(b)(3) & (c).

    If a disagreement arises regarding a child's IEP or
other rights under the IDEA, a party may seek an administrative
"due process hearing" before a state or local educational
agency. Id. § 1415(f). In Pennsylvania, the Department of
Education Office of Dispute Resolution is responsible for
handling such complaints. See Mary T. v. Sch. Dist. of
Philadelphia, 575 F.3d 235, 240 n.1 (3d Cir. 2009). At the
conclusion of the administrative process, the losing party may
seek relief in state or federal court. 20 U.S.C.
§ 1415(i)(2)(A). The reviewing court shall receive the
administrative record and shall also hear additional evidence at
the request of a party. Id. § 1415(i)(2)(C).

    In cases arising under the IDEA, we apply a "modified
de novo" standard of review, under which we give "due weight"
and deference to the factual findings of the hearing officer in
the administrative proceedings. P.P. ex rel. Michael P. v.

W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009).
While factual findings from the administrative proceedings are
to be considered prima facie correct, we may depart from those
findings if we fully explain why by citing to the administrative
record. S.H. v. State-Operated Sch. Dist. of City of Newark,
336 F.3d 260, 270 (3d Cir. 2003). We must accept the hearing
officer's credibility determinations "unless the
non-testimonial, extrinsic evidence in the record would justify
a contrary conclusion or unless the record read in its entirety
would compel a contrary conclusion." Id. (quoting Carlisle Area
Sch. Dist. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995)). The
district court may not "substitute its own notions of
educational policy for those of local school authorities." Id.
Our review of legal standards and conclusions of law is plenary.
P.P. ex rel. Michael P., 585 F.3d at 735.

        The burden of proof in an administrative hearing under
IDEA is placed upon the party seeking relief, which in this case
was C.M. and his parents. Schaffer v. Weast, 546 U.S. 49, 62
(2005); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 391 (3d Cir.
2006). However, as the party challenging the administrative
decision, MCIU bears the burden of persuasion before this court.
Ridley Sch. Dist. v. M.R., 680 F.3d 260, 270 (3d Cir. 2012).

We first turn to the facts as set forth in the administrative record.[1]  MCIU provides early intervention services for children with disabilities residing in Montgomery County from age three through the beginning of kindergarten pursuant to a contract with the Commonwealth of Pennsylvania. See 11 P.S. § 875-104.  In October 2014, C.M.'s parents approached MCIU seeking an evaluation of C.M., who was then three years old, for services under the IDEA.  At that time, C.M.'s parents had concerns that C.M. was having difficulty sitting still, socializing, communicating with peers, and transitioning between activities, as well as carrying out fine motor skills.  C.M.'s parents also reported that C.M. had been asked to leave three mainstream preschools due to behavioral issues.  C.M.'s pediatrician previously had evaluated C.M. for autism in September 2014 but concluded that the diagnosis "could go either way 50%-50%."  At the time, C.M. attended a regular education preschool, Little Angels.

C.M.'s initial evaluation included input from C.M.'s parents, as well as an occupational therapist, psychologist, speech therapist, behavioral consultant, and C.M.'s teacher.  As part of the initial evaluation, C.M.'s preschool teacher

---

1.  As neither party has sought to submit additional evidence, we limit our review to the administrative record.

provided written information.  She wrote that C.M. engaged in several behaviors associated with autism while at school, including fixation on certain topics, parroting out of context speech heard in movies or television, refusal of non-preferred activities including running out of the classroom, and limited verbal interaction with other children.  The teacher also communicated that C.M. had average cognitive ability and a "vast" vocabulary, although C.M. had difficulty using that vocabulary to communicate with his peers.  A psychologist employed by MCIU observed C.M. while at preschool.  She similarly observed that C.M. had trouble following classroom routine and interacting with peers.  Nonetheless C.M. seemed interested in his classmates and responded well to direction.

The initial evaluation included several standard assessment tools including:  the Conners Early Childhood Rating Scale ("Conners"), an instrument designed to assess behavioral, emotional, social, and developmental issues in young children; and the Autism Spectrum Rating Scale ("ASRS"), which is used to quantify observations of a child that are associated with autism.  The initial evaluation also included:  the Battelle Developmental Inventory ("Battelle"), which is used to assess adaptive behavior, social and communication skills, and cognitive ability; the Developmental Assessment of Young Children, Second Edition, which identifies potential delays in

gross motor skills and adaptive behavior; the Peabody Developmental Motor Scales, Second Edition, which is used to assess fine motor skills' the Preschool Language Scales-5; and a Functional Behavioral Assessment.

On the Battelle, C.M.'s scores demonstrated a mild delay in the area of social ability and a significant developmental delay in cognitive ability. On the Conners, C.M.'s parents reported concerns with impulsivity, attention/hyperactivity, and adaptive skills, but C.M.'s scores were otherwise average. On the ASRS, C.M.'s mother expressed concerns about socialization but overall rated C.M. as "average," which was defined as not showing great concern that C.M. was autistic. Although the ASRS and Conners typically include both parent and teacher ratings, the MCIU psychologist only asked C.M.'s parents for these assessments.

On December 8, 2014, MCIU issued its initial Evaluation Report for C.M. In its report, MCIU found C.M. eligible for special education services under the disability category of emotional disturbance. On December 17, 2014, MCIU issued an IEP, which laid out the services C.M. would receive and his educational goals. Under the IEP, C.M. would be given six hours weekly of personal care assistance, despite the fact that the MCIU behavioral support consultant had recommended ten hours per week. C.M. would also have two hours weekly of

behavioral support and 45 minutes weekly of occupational therapy. These services were to be provided at Little Angels and were scheduled to start on January 5, 2015. C.M. did not receive any speech therapy or physical therapy.

The services initially provided to C.M. were delayed. C.M. received no personal care assistance from January 5, 2015 through January 27, 2015. Between January 28, 2015 and March 30, 2015, C.M. was given a total of only 10.5 hours of personal care assistance. The record shows that these delays were due at least in part to personnel changes.

On February 26, 2015, the IEP team reconvened to discuss difficulties C.M. was experiencing at Little Angels. After that meeting, MCIU increased C.M.'s behavioral support from two to three hours weekly and occupational therapy from 45 minutes to one hour per week. The amount of personal care assistance did not change.

On February 27, 2015, C.M. was evaluated at the request of C.M.'s parents by a psychologist with the Central Montgomery MH/MR Center Preschool Intervention Program ("PIP"), a program not associated with MCIU. C.M.'s parents reported that C.M. was experiencing a great deal of difficulty in his current preschool placement and that they were seeking treatment for his behavioral problems. The PIP psychologist concluded that "some of [C.M.'s] behaviors would be consistent with Autism

Spectrum Disorder but this is not clear based on this assessment." He also found that C.M. had symptoms consistent with moderate to severe Attention Deficit Hyperactivity Disorder ("ADHD"). The psychologist recommended that C.M. be placed in a partial hospitalization program offered by PIP.

On April 20, 2015, C.M.'s parents placed C.M. in the PIP partial hospitalization program on an outpatient basis for three hours a day, five days per week. During this time, C.M. continued to receive services from MCIU under his IEP at his home in the morning and attended the PIP program in the afternoon. However, MCIU services were again provided on a delayed basis and by April 2015, MCIU acknowledged that it owed C.M. 66 hours of personal care assistance. MCIU also owed behavioral support services to C.M.

On May 1, 2015, while C.M. was still in the PIP partial hospitalization program, MCIU issued a reevaluation report for C.M. This report was the culmination of reevaluations in the areas of physical and speech/language development requested by C.M.'s parents in March 2015. The report noted that C.M.'s parents continued to be concerned with his ability to interact with peers. The report, with input from C.M.'s regular education preschool teacher, stated that C.M. continued to have difficulty interacting with other children and answering questions. As a result of the reevaluation, MCIU

issued a revised IEP on May 20, 2015. This IEP added 30 minutes of physical therapy per week, 30 minutes of individual speech and language therapy every fourteen days, and 30 minutes of speech and language consult every 30 days. All other services remained the same, and C.M. remained classified as a child with emotional disturbance.

On May 7, 2015, PIP diagnosed C.M. with Autism Spectrum Disorder, with a "rule-out" of ADHD, meaning that ADHD was suspected but that more information was required for a conclusive diagnosis. The PIP found that C.M. had difficulty with eye contact and social interaction, and sustaining communication with others. He used repetitive and scripted language and required verbal prompting and assistance to complete tasks, to engage with peers, and to transition between activities. While there was conflicting evidence before the hearing officer regarding when MCIU actually received the PIP discharge summary with C.M.'s autism diagnosis, we agree with the hearing officer's finding that C.M.'s mother informed MCIU of the autism diagnosis and offered to provide the PIP discharge report to MCIU in June 2015.

In June 2015, C.M. was discharged from PIP and began a recreational summer day camp. This summer camp was unilaterally selected by C.M.'s parents and did not have any educational

component.  During this time, MCIU continued to provide C.M.
with services under his IEP, both at his home and the camp.

In September 2015, C.M.'s parents discussed a school
placement for C.M. with MCIU.  On September 16, 2015, the IEP
team reconvened and MCIU issued a NOREP recommending for the
first time a developmental preschool for C.M.  The NOREP did not
specify a particular developmental preschool.  Thereafter,
C.M.'s parents considered and rejected two developmental
preschools suggested by MCIU.  On September 23, 2015, C.M.'s
parents rejected the NOREP.  MCIU then suggested a third
developmental preschool, but ultimately that school did not
accept C.M.[2]

During this time, C.M. was receiving services from
MCIU at his home and was not enrolled in any classroom setting.
C.M.'s mother was concerned that C.M. was regressing.  C.M.'s
diagnosis under his IEP remained emotional disturbance.  In
October 2015, MCIU offered to reevaluate C.M. in light of the
PIP's autism diagnosis.  C.M.'s parents declined the
reevaluation and instead requested an Independent Educational
Evaluation ("IEE") in November 2015.

---

2.  There was conflicting testimony before the Hearing Officer
about why the third developmental preschool rejected C.M.
Regardless, we agree with the Hearing Officer's finding that the
reasons for the rejection are ultimately irrelevant.

On November 16, 2015, the IEP team again reconvened. By this meeting, the team agreed that C.M. should attend a fourth developmental preschool, the MCIU Language Classroom, which is a specialized preschool program with a primary focus on speech and language therapy. MCIU issued a revised IEP that reflected the Language Classroom placement and maintained all goals and services in the prior IEP, with the exception of removing 30 minutes of speech/language consultation per month. On November 20, 2015, C.M. began attending the Language Classroom for three hours per day, four days per week. In addition, MCIU continued to provide speech therapy, occupational therapy, physical therapy, and behavioral support to C.M.

On February 2, 2016, a doctoral-level neuropsychologist issued the IEE. After extensive observation and testing of C.M., the evaluator diagnosed C.M. with autism. He also opined that C.M.'s placement in the Language Classroom was appropriate but should have started sooner. In particular, the evaluator concluded that C.M. would benefit from a "language rich" environment with a low student-to-teacher ratio and a highly-structured environment with high-interest learning tools. The evaluator also determined that C.M. required intensive speech and language therapy services, which he defined as four to five sessions of less than one hour each on a weekly basis as

well as social skills interventions and occupational therapy for fine motor skills.

On May 13, 2016, after review of the IEE, MCIU issued a reevaluation report and changed C.M.'s classification from emotional disturbance to autism. The services being provided to C.M. did not change as a result of this diagnosis, and the report concluded that all of C.M.'s needs were being addressed by his current IEP. The report found that C.M. had "made great progress in his language and social skills during his time at the MCIU Language classroom." It included that C.M. was "very motivated to use his speech and language" during preschool, "demonstrated age appropriate speech skills," and had good speech intelligibility. The report also stated that C.M. was responding to teacher instructions and accepting an adult stating "no" without refusal or "engaging in interfering behaviors." It further noted that C.M. would "sustain reciprocal play interaction" with peers and adults. Overall, the report concluded that C.M. made meaningful progress on all of his IEP goals and that C.M. was "an active participant throughout his preschool day."

C.M.'s teacher, as well as his speech and language therapist, similarly found that C.M. made progress during his time in the Language Classroom. Before the hearing officer, C.M.'s teacher Stacy-Ann Donovan testified that she witnessed an

improvement in C.M.'s social interaction, speech, and physical abilities during his time in the Language Classroom. C.M.'s speech and language therapist Arielle Cragin also testified that C.M. made significant progress during this time. While C.M. initially engaged in only parallel play and did not engage with his peers, later "he made friends, he was able to interact with his peers, he made relevant spontaneous comments during routine activities . . . [and] his eye contact improved."

The IEP team then met on May 26, 2016 for an annual review. Although MCIU recommended C.M. remain in the Language Classroom, C.M.'s parents elected to place C.M. in a recreational summer camp beginning in June. C.M.'s last day in the Language Classroom was June 9, 2016. After summer camp ended, C.M. began kindergarten in his local public school district.

Defendants filed their administrative due process complaint on September 21, 2016. After three full days of hearings, the hearing officer issued his decision on January 11, 2017. The hearing officer concluded that MCIU violated C.M.'s procedural rights under the IDEA by improperly classifying C.M. as a student with emotional disturbance from January 5, 2015 to May 13, 2016. The hearing officer also found that MCIU substantively denied C.M. a FAPE between January 5, 2015 and June 9, 2016. As a remedy, the hearing officer awarded five

hours of compensatory education for each day the MCIU was in session during the time a FAPE was denied.  This amounted to a total of 1350 hours.  Thereafter, MCIU filed this appeal.

III.

MCIU first asserts that the hearing officer erred in finding that the MCIU conducted an inappropriate initial evaluation of C.M., which led to C.M. being classified incorrectly as emotionally disturbed instead of autistic.  This incorrect classification remained from the time of C.M.'s initial evaluation on December 8, 2014 until the reevaluation report changing his diagnosis to autism on May 13, 2016.

Under the IDEA, local educational agencies must conduct a "full and individual initial evaluation" of the child in all areas of suspected disability.  20 U.S.C. § 1414(a)(1)(A) & (b)(3)(B).  The evaluation must utilize "a variety of assessment tools and strategies to gather functional, developmental, and academic information about the child, including information provided by the parent," to determine whether the child is a child with disabilities.  Id. § 1414(b)(2)(A).  Furthermore, the agency must "not use any single measure or assessment as the sole criterion" for determining whether a child qualifies for services and must "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to

-14-

physical or developmental factors." Id. § 1414(b)(2)(B) & (C).
Assessments and other evaluation materials must, among other
requirements, be "used for the purposes for which the
assessments or measures are valid and reliable" and administered
by "trained and knowledgeable personnel . . . in accordance with
any instructions provided by the producer of such assessments."
Id. § 1414(b)(3).

The hearing officer found that the initial evaluation
and classification of C.M. as emotionally disturbed rather than
autistic was inappropriate because the MCIU did not ask C.M.'s
teacher to complete the ASRS and Conners rating scales and
instead relied on ratings from C.M.'s parents only, even though
"these assessments are designed to obtain information from
multiple raters in multiple settings."  The hearing officer also
found that MCIU lacked certain "valuable information," namely
the Child and Family Profile Form, and because the psychologist
testified she "wasn't aware that [C.M.] was possibly qualified
as developmentally delayed in other areas" when she diagnosed
C.M. with emotional disturbance.

We find that the appropriateness of the initial
evaluation is a close question.  Taken as a whole, MCIU used a
variety of assessment tools and obtained information on C.M.'s
behavior in both the home and school settings.  But there is no
dispute that C.M. does in fact have autism, not emotional

disturbance.  Moreover, MCIU had notice of the autism diagnosis by PIP as early as June 2015 and yet failed to offer to reevaluate C.M. until October 2015.

We ultimately need not decide this issue because, even assuming the hearing officer erred in finding that the initial evaluation and classification of C.M. violated IDEA, such error is harmless.  The hearing officer ultimately concluded that the improper evaluation and classification by MCIU violated only C.M.'s procedural rights under IDEA and that "there is no preponderance of evidence linking the incorrect classification to any substantive harm" to C.M.  He therefore did not award any compensatory education to C.M. on this basis.[3]  This finding is in accord with IDEA, which provides that agencies must offer IEP services based on needs and not classification.  See 20 U.S.C. § 1414(d)(3); 34 C.F.R. § 300.304(c)(6).  We will therefore affirm the hearing officer's decision on this issue.

IV.

We turn next to the separate issue of whether MCIU substantively denied C.M. a FAPE between January 5, 2015 and June 9, 2016.  The hearing officer found that C.M. "made only trivial progress across all domains during the period of time in question" and therefore was denied a FAPE.

_____

3.  Under the IDEA, a plaintiff claiming a procedural violation alone is limited to prospective injunctive relief.  See C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66 (3d Cir. 2010).

Shortly after the hearing officer issued his decision, the Supreme Court clarified the standard for determining whether children with disabilities are receiving a FAPE as required by IDEA in Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1, 137 S. Ct. 988 (2017). There, the Court held that an agency must offer an educational program "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Id. at 1001. Thus, the adequacy of a given IEP turns on the unique circumstances of the child for whom it was created. Id. at 999-1002. While an IEP need not be ideal, it must confer more than a de minimis benefit. Id.

On appeal, MCIU first asserts that the hearing officer applied the incorrect standard in determining whether C.M. was denied a FAPE. In his decision, the hearing officer stated that an IEP must be "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." This standard was appropriate in light of precedent from our Court of Appeals at the time. See Mary Courtney T. v. Sch. Dist. of Phil., 575 F.3d 235, 240 (3d Cir. 2009); Shore Reg'l High Sch Bd. of Ed. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004). Furthermore, the language "in light of the student's intellectual potential" is substantively similar to the "in light of the child's

-17-

circumstances" standard announced in Endrew F. MCIU's argument that the hearing officer applied a stricter standard is not supported by the actual text of the hearing officer's decision.

MCIU next contends that the hearing officer erred in concluding that MCIU denied C.M. a FAPE during the time C.M. was placed in a regular education preschool because C.M. was in the least restrictive environment as required by IDEA. This argument fails. The IDEA provides:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5). However, placement in a mainstream or regular education setting is appropriate only to the extent that it "satisfactorily educates" the child. S.H., 336 F.3d at 272. Here, the record demonstrates that C.M. required a developmental preschool from the inception of his IEP. As discussed above, C.M. was previously asked to leave three different mainstream preschools due to behavioral issues. In addition, his initial evaluation suggested that C.M. suffered from a significant cognitive developmental delay. After he began receiving services from MCIU, C.M. continued to struggle in a fourth

-18-

regular education preschool, prompting his parents to withdraw him and place him in the PIP partial hospitalization program, where he ultimately received an autism diagnosis for the first time. During this time, C.M. was not receiving the amount of personal care assistance initially recommended by MCIU's own staff and services to which he was entitled under his IEP were being provided on a delayed or intermittent basis.

MCIU also asserts that the hearing officer inappropriately applied the FAPE standard from April 2015 until the beginning of September 2015, when C.M. was in the PIP partial hospitalization program and then a private summer camp. According to MCIU, these were programs unilaterally chosen by C.M.'s parents and over which MCIU had no control. We are not persuaded. There is no disagreement that C.M. had IEPs in place at all times from January 5, 2015 through June 9, 2016, and that MCIU did in fact provide IEP services to C.M. both while C.M. was at PIP and during his time at summer camp. Accordingly, MCIU remained responsible for providing a FAPE during this time.

MCIU finally asserts that the hearing officer erred in finding that MCIU denied C.M. a FAPE from November 20, 2015 through June 9, 2016, when C.M. was enrolled in MCIU's Language Classroom. We agree with MCIU on this point. Dr. Stone, the independent expert who performed the IEE of C.M., observed the Language Classroom and opined that it met much of the criteria

-19-

he had recommended for C.M, including: (1) a language-rich environment with frequent models for verbal behavior and visual supports; (2) a low student-to-teacher ratio; (3) a highly structured learning environment; and (4) access to high interest learning tools. Dr. Stone also opined that C.M. should receive "intensive" speech and language therapy services, which he defined as four to five sessions per week. The hearing officer recognized this in his decision:

> Nothing in the IEE [Dr. Stone's Report] suggests that the developmental preschool [the MCIU Language Classroom] was inappropriate for Student. To the contrary, the report recommends the type of environment found at the developmental preschool. In general, the neuropsychologist opined that Student's placement was appropriate, but should have started sooner.

The hearing officer offers no explanation in his decision as to why the MCIU denied C.M. a FAPE during the time period C.M. was in the Language Classroom when his own findings of fact support the opposite conclusion.

The hearing officer found that there was no reliable quantitative evidence of C.M.'s progress in the record and therefore C.M.'s evaluations provided the best evidence of his progress while receiving services from MCIU. He then concluded that, taken as a whole, C.M.'s evaluations from October 2014 through May 2016 "illustrate only trivial progress over time." In support, the hearing officer noted that C.M. "worked on

proper use of scissors for nearly 17 months." He did not otherwise explain his finding of trivial progress.

Based on our review of the administrative record as a whole, we disagree with the hearing officer's finding that C.M. made only trivial progress as to the period when C.M. was in the Language Classroom from November 20, 2015 through June 9, 2016. As discussed above, the May 2016 reevaluation report demonstrates that C.M. made progress, including that C.M. was "actively participat[ing]" in preschool activities in the Language Classroom," was independently greeting peers and making improved eye contact, was "very motivated" to use his speech skills, and "is making positive strides with his social and emotional skills." In addition, there was significant testimony, including from C.M.'s teacher Stacy-Ann Donovan and C.M.'s speech and language therapist Arielle Cragin, about C.M.'s progress in social interaction, speech, and physical abilities during his time in the Language Classroom. This narrative of progress, combined with Dr. Stone's finding that the Language Classroom was an appropriate placement, leads us to conclude that the hearing officer erred when he determined that C.M. was denied a FAPE from November 20, 2015 through June 9, 2016.

V.

Having found that MCIU denied C.M. a FAPE only from
January 5, 2015 through November 19, 2015, we now turn to our
review of the hearing officer's award of compensatory education.
In his decision, the hearing officer recognized there are two
competing methodologies for calculating an award for
compensatory education:  (1) the "hour for hour" method, under
which a court may award one hour of compensatory education for
each hour a FAPE was denied; and (2) the "same position"
approach, under which an award of compensatory education should
be designed to put the student in the same position he or she
would have been but for the denial of a FAPE.  To compensate for
MCIU's failure to provide C.M. with a FAPE, the Hearing Officer
used the "hour for hour" method and awarded defendants five
hours of compensatory education for each day MCIU was in session
from January 5, 2015, when the first IEP for C.M. was issued,
through June 9, 2015, the last day C.M. attended the MCIU
Language Classroom.

In M.C. v. Central Regional School District, our Court
of Appeals held that "a disabled child is entitled to
compensatory education for a period equal to the period of
deprivation, excluding only the time reasonably required for the
school district to rectify the problem."  81 F.3d 389, 392 (3d
Cir. 1996).  Some courts have interpreted this language as

-22-

requiring an award of full days of compensatory education for the period of deprivation, as the Hearing Officer here did. See, e.g., Damian J. v. Sch. Dist. of Phila., No. 06-3866, 2008 WL 191176, at *7 & n.15 (E.D. Pa. Jan. 22, 2008) (citing Keystone Cent. Sch. Dist. v. E.E. ex rel. H.E., 438 F. Supp. 2d 519, 526 (M.D. Pa. 2006)). However, in Ferren C. v. School District of Philadelphia, the Court of Appeals later explained that compensatory education "should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." 612 F.3d 712, 718 (3d Cir. 2010) (quoting Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 523 (D.D.C. 2005)). In doing so, the Court of Appeals did not explicitly reject the "hour by hour" approach nor overrule M.C. As a result, courts within this Circuit have followed both approaches. See, e.g., Jana K. ex rel. Tim K v. Annville-Cleona Sch. Dist., 39 F. Supp. 3d 584, 605-06 (M.D. Pa. 2014).

Here, the Hearing Officer recognized that "courts have expressed a preference for a 'make whole' compensatory education calculation," but reverted to an "'hour-for-hour' method" based on a finding that C.M. and his parents failed to present evidence for a "make whole" calculation. He found by a preponderance of the evidence that C.M. "required intensive, full-day support found only in specialized classrooms" as well

-23-

as additional physical and occupational therapy, and that those needs totaled five hours per day.  We agree with the hearing officer that in a case such as this, where MCIU's failure to provide appropriate services permeated C.M.'s whole day and resulted in a lack of meaningful progress, "parsing out the exact amount of hours [a student] was not benefitted by [a] FAPE would place an arduous and near impossible task on administrative bodies."  Jana K., 39 F. Supp. 3d at 609-10 (quoting Keystone Cent. Sch. Dist., 438 F. Supp. 2d at 525-26).  Thus, the award of five hours a day was appropriate here.

Although we will affirm the hearing officer's award of five hours per day of compensatory education, we find that the hearing officer erred in awarding compensatory education for the period of November 20, 2015 through June 9, 2016.  As discussed above, C.M. received a FAPE while in the Language Classroom and accordingly is not entitled to compensatory education for that time period.  We therefore will reduce the award of compensatory education to C.M. and enter an order awarding compensatory education of five hours per day for C.M. for each day the MCIU was in session for the time period of January 5, 2015 through November 19, 2015.

### VI.

Finally we turn to defendants' request that this court convert the hearing officer's award of compensatory education

-24-

hours into a monetary trust on behalf of C.M.  The creation of a trust fund is granted only "on a case-by-case basis, depending on the specific situation of each student" and "to ensure that a student is fully compensated" for violations of his or her rights under the IDEA.  Ferren C., 612 F.3d at 720.  We do not find that such unique circumstances are present here and therefore decline defendants' request.

VII.

Accordingly, the motion of MCIU for judgment on the administrative record is granted in part and denied in part.